Filed 8/28/23  In re Lopez CA1/1
Opinion on remand from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re RICO RICARDO LOPEZ, on Habeas Corpus. | A152748 (Sonoma County Super. Ct. No. SCR32760) |

Petitioner Rico Ricardo Lopez was convicted of first degree premeditated murder.  The trial court later granted Lopez's petition for a writ of habeas corpus after our Supreme Court invalidated one of the three theories upon which the jury was instructed (the natural and probable consequences doctrine) for first degree premeditated murder.  (*People v. Chiu* (2014) 59 Cal.4th 155, 166 (*Chiu*).)  This court reversed in an unpublished opinion after concluding that the *Chiu* error was harmless under the circumstances of the case because the jury found true a gang-murder special circumstance which included the finding that Lopez intended to kill (Pen. Code, § 190.2, subd. (a)(22)).[1]  (*In re Lopez* (Sept. 25, 2019, A152748) [nonpub. opn.] (*Lopez I*).)

The Supreme Court granted review and concluded that the special circumstance was insufficient standing alone to establish harmlessness.  (*In*

---

[1] All statutory references are to the Penal Code.

1

*re Lopez* (2023) 14 Cal.5th 562, 568 (*Lopez II*).)  It also found that this court had not "rigorously review[ed] the evidence to determine" whether the *Chiu* error was harmless.  (*Ibid.*)  Instead of explaining whether its own review of the evidence revealed harmlessness, the court remanded to this court to reexamine the issue.  Applying the standard as articulated by the Supreme Court, we conclude that the *Chiu* error was not harmless beyond a reasonable doubt.  We therefore affirm the trial court's order granting Lopez's petition for a writ of habeas corpus.

## II.
### FACTUAL AND PROCEDURAL BACKGROUND

In *Lopez II*, the Supreme Court provided a detailed summary of the facts presented in the prosecution's case against Lopez, something that was not included in the opinion resolving Lopez's original appeal since Lopez did not challenge the evidence supporting his conviction.  (*People v. Amante et al.* (Sept. 3, 2009, A113655) (*Amante*) [nonpub. opn.].)  We quote extensively from the factual summary in *Lopez II*.

"Sometime before midnight on June 26, 2002, Miguel and Rebecca S. stopped their car on a bridge in Santa Rosa, California because Miguel saw his father walking on the side of the road.  Miguel got out to speak with him, while Rebecca remained in the car with their young children.  A creek and bicycle path ran underneath the bridge.  Miguel saw the victim, [Ignacio] Gomez, riding his bicycle.  Miguel knew Gomez was his father's friend, but he did not recognize Gomez at the time.  Gomez said hello to Miguel and his father, and they whistled back and forth.  Gomez turned, rode underneath the bridge, and continued along the bicycle path.  Gomez was wearing blue clothing indicative of the Sureño criminal street gang.  He was engaged to a Sureño associate and knew their distinctive whistle.

"Miguel and Rebecca noticed a group of young men jumping over a fence that separated the creek from an apartment complex. Four men, two of whom Rebecca identified as [Patrick] Higuera[, Jr.] and [Mario] Ochoa-Gonzales, walked past. One of the unknown men said 'Norte' or asked if Miguel 'bang[ed] Norte.' The man showed Miguel what appeared to be a knife handle in his pants pocket. Miguel responded, 'I don't bang nothing,' and the men kept walking. . . .

"Three of the men went down the path after Gomez, while Ochoa-Gonzales hung back. A fifth man, apparently [Peter] Amante, came by afterward. He was with two young women. Miguel saw Amante drop a knife, pick it up, and run toward Gomez. From a distance, Miguel saw three men attacking Gomez. One man, wearing a white shirt, had a knife and was making stabbing motions. Miguel later identified that man as Amante.

"After the attack, the group walked back past Miguel and Rebecca. Miguel saw blood on two of the men. Both were wearing white shirts, and one was Amante. Miguel later clarified that Amante was wearing a red San Francisco 49ers football jersey with a white tank top underneath; the blood was on the tank top but not the jersey. Miguel and Rebecca drove away and called police to report the attack.

"Police officers responded, but they did not find anything at the time. Gomez's body was discovered the next morning, along the bicycle path. His pants were pulled down, and there was blood nearby. Police also found four pieces of a broken knife blade at the scene.

"An autopsy revealed that Gomez had suffered approximately 40 to 44 sharp-force injuries, including 38 to 40 stab wounds. The majority of the stab wounds, approximately 25 to 28, were inflicted on Gomez's left flank. These wounds perforated Gomez's left lung, his diaphragm, and his left

kidney.  One stab was so forceful that it broke one of Gomez's ribs.  Gomez also had three stab wounds and four incised wounds to his head, including a stab wound behind his left ear, a slash across his left jaw, and a large incised wound to his scalp.  Finally, Gomez had three stab wounds to his chest, one of which pierced his heart and caused his death.

"The two women in the group [with the defendants], Kacee Dragoman and Lindsay Ortiz, testified at trial.  Both were granted immunity, and their accounts of the night's events were largely consistent. . . .

"On the night of the attack, the defendants here — Lopez, Amante, Higuera, Cardenas, and Ochoa-Gonzales — were drinking and socializing with Dragoman, Ortiz, and others in the apartment shared by Amante and Dragoman.  Lopez, Amante, Higuera, Cardenas, and Ochoa-Gonzales were all active participants in the Norteño criminal street gang.  Dragoman associated with the Norteño gang, and Ortiz was friends with many Norteños. . . .  [T]he Norteños were in a deadly rivalry with the Sureños.  Amante himself had been stabbed and severely wounded by Sureños during a Cinco de Mayo celebration a couple months earlier.

"During the party, Dragoman was outside on her patio with several other people.  They heard some whistling, and Dragoman recognized it as a Sureño gang whistle.  It was a 'bad sign,' according to Dragoman, because '[u]sually if they whistled, more were coming.  They're hollering for more people to come out.  They're signaling.'  Someone at the party said, ' "It's a Scrap whistle," ' and Ochoa-Gonzales yelled some remarks over the fence.  ('Scrap' is a derogatory term for Sureño.)  Dragoman recalled everyone getting 'antsy' and 'mak[ing] each other excited.'  The defendants ran into the kitchen.  Dragoman and Ortiz heard sounds like drawers opening and closing.

4

"The defendants ran outside. Dragoman and Ortiz followed. The women came upon Amante, who had tried to climb over the fence but got stuck. Amante appeared to be intoxicated. Dragoman and Ortiz thought the situation was somewhat humorous and helped him down. Amante kept walking toward the creek, while Dragoman and Ortiz took a longer way around.

"Dragoman and Ortiz saw Amante again on the bridge. He was approaching several people who had stopped there, presumably Miguel, Rebecca, and Miguel's father. Ortiz said Amante had a knife in his hand like he was going to stab someone. Dragoman recalled that Amante dropped a large butcher's knife at that point, picked it up, and said something rude to Miguel and his father. Dragoman recognized the butcher's knife as one from her kitchen. Ortiz thought that Amante either dropped the knife or Dragoman took it from him. Regardless, Amante continued along the path toward the creek.

"Ortiz testified that Amante disappeared from view for about five minutes. She initially saw Lopez, Cardenas, and Ochoa-Gonzales coming back from the creek, without Amante and Higuera. Lopez was wearing a white Raiders football jersey with black lettering, and Ortiz noticed blood on the front of his shirt. Amante and Higuera emerged afterward. Higuera had a cut on his arm and appeared to be in pain.

"Dragoman recalled seeing Amante meet up with the other defendants, then walk farther down the path with Higuera. They were gone for about 15 or 30 seconds. She confirmed Lopez was wearing a white Raiders jersey and Amante was wearing a red 49ers jersey with a white shirt underneath. When Dragoman saw Lopez, he was wearing a dark blue beanie that he did not have before the attack.

5

"The defendants, Dragoman, and Ortiz all walked back over the bridge to the apartment complex. Lopez had a black knife handle in his hand, which Dragoman recognized from a knife set in her kitchen. After the group arrived back at the apartment, Dragoman remembered that Lopez was '[v]ery bouncy' and '[h]appy.' He had the blue beanie on his head and 'was kind of like bragging[,] like walking around with a little strut, stuff like that.' Ortiz saw Lopez wearing the blue beanie as well, which she remembered as having the word 'Sur' on it. Ortiz thought Lopez was 'excited' and 'pretty happy.' He said 'something about that guy dying' and told Amante that 'this was for Cinco de Mayo.' Amante responded, ' "What the fuck are you talking about?" ' Lopez said something in response, and everyone got quiet.

"Dragoman watched Ochoa-Gonzales flush a knife handle (apparently the one Lopez was carrying) down the toilet. Dragoman put the knife Amante was carrying back in a kitchen drawer. Dragoman did not see anyone else with a knife that night.

"Dragoman asked Lopez and Ochoa-Gonzales to take their clothes off so she could wash them. Ortiz helped. Dragoman saw blood on Lopez's shoes. Ortiz saw Ochoa-Gonzales pacing back and forth. He looked scared. He kept saying there were ' "cops in the creek." ' At one point, Ochoa-Gonzales said, ' "I don't think that guy was a Scrap." ' Eventually, all of the defendants except Amante left the apartment.

"The next morning, Dragoman found the blue beanie in her kitchen. She put it in a brown paper sack and threw it away in a stranger's garbage across town. Dragoman also noticed that her knife set was no longer complete; several knives were missing. All of the knives had markings and serial numbers that would identify them as part of a set, so Dragoman and Amante decided to get rid of the remaining knives. They drove into the

6

countryside and threw them away, along with the knife block. Police were able to recover several of those knives, and Dragoman identified them as part of her set. Dragoman identified the broken knife blade found near Gomez's body as part of her set as well." (*Lopez II*, *supra*, 14 Cal.5th at pp. 570–572.)

"According to a pathologist, it was difficult to tell with any degree of certainty how many stabbing instruments were involved in the attack. The knives police recovered from Dragoman's knife set (apparently steak knives) could have made any of the wounds on Gomez's body. Other knives of a similar size could have made the wounds as well. The knife whose blade was found broken at the scene could have inflicted some of the stab wounds, including two of the wounds to Gomez's chest. In the pathologist's opinion, a single person could have inflicted all of the wounds in less than a minute.

"A criminalist tested the broken knife blade for traces of blood. He obtained a presumptive positive result, but further testing could not confirm the presence of blood. The criminalist also examined the knife's serrated edges. Based on his experience, the criminalist would have expected to see more blood, tissue, or other material in the serrated areas of the knife if it had been used to stab a person." (*Lopez II*, *supra*, 14 Cal.5th at p. 572.)

A police gang expert opined at trial that the Norteños were a criminal street gang under California law (§ 186.22, subd. (f)), and that the creek where Gomez was killed was disputed territory with another criminal street gang, the Sureños. The expert further opined that each defendant, including Lopez, was an active participant in the Norteños street gang. And he testified that assuming the facts of the prosecution's case were true, such a murder would have been committed for the benefit of or in association with a criminal street gang.

"In testimony to be considered against Lopez only, a jail inmate named Richard Smith recounted an argument with Lopez while they were both incarcerated.  During the confrontation, Lopez turned to Smith and said, ' "I'll kill you just like I killed the guy in the creek." '  Smith had several previous felony convictions.  He was a longtime heroin addict and was taking methadone.  On cross-examination, Lopez's counsel introduced various letters Smith had written to the prosecutor requesting favors.  Smith said he hoped his testimony would help him at sentencing in a pending criminal case, although the prosecution had not promised anything." (*Lopez II*, *supra*, 14 Cal.5th at p. 574.)

"In his closing argument, the prosecutor did not expressly name the person or persons who stabbed Gomez.  He explained, 'In this case, there is no burden on the People to establish who the actual stabber was . . . .  Simply that there was a stabber and that the defendants here on trial were either that stabber or an aider and abettor in the crime of that stabber.'  The prosecutor discounted the possibility that either the broken knife found at the scene or the large butcher knife Amante carried were the murder weapon.  Both knives were too large and, as to the broken knife, it did not have the expected amount of blood on its blade.  The prosecutor suggested that the wounds were entirely consistent with the smaller steak knives from Dragoman's knife set.  He argued that at least one other defendant must have had a knife and used it against Gomez.  Given this uncertainty, the prosecutor focused on two theories of aiding and abetting, either directly or under the doctrine of natural and probable consequences.  He explained each theory to the jury.

"Regarding Lopez specifically, the prosecutor noted that he was wearing a white Raiders jersey, so he could have been the stabber Miguel

8

identified.  He also had blood on his shirt, according to Ortiz, and on his shoes, according to Dragoman.  The prosecutor argued that Lopez personally wielded the knife that was found broken, 'because there's no other evidence of another broken knife out at the scene or anywhere else.'  It must have broken against a rock or the asphalt path, and '[t]hat tells you that [Lopez] was there and he was actively participating in the attack on [Gomez].  Whether or not that knife pierced [Gomez's] body makes no difference.'  The prosecutor argued that Lopez had an added incentive to kill someone he believed to be a Sureño, since he was from an out-of-town subset of the Norteños.  It was an enormous success for him to kill a Sureño, and his attitude afterward reflected that.

"The prosecutor said it was possible Lopez personally stabbed Gomez, but it was not probable given the size of the broken knife and the absence of any substantial amount of blood.  So, according to the prosecutor, Lopez was a direct aider and abettor to murder: 'He knew of the unlawful purpose of the person right there with him.  Maybe it was the person who pantsed [Gomez].  Maybe it was the person who stabbed [Gomez] in the head splitting his skin to his skull or driving the knife into his chest.  But he was there.  He was right there.  And he shattered his knife during the attack.  Absolutely had knowledge.  Intended to commit or encourage or facilitate the crime?  Beyond any question.  By act or advice did he aid, promote, encourage or instigate its commission?  Of course he did.  Whether or not he's the actual stabber.'

"The prosecutor also touched on the natural and probable consequences doctrine: 'And finally, nonhomicide target crimes.  Even if you think that he was down there just trying to stab a Scrap, maybe.  Maybe, despite all the evidence, he just wanted to really seriously wound the guy.  It doesn't matter. He aided and abetted in that serious attack someone that was right there

9

with him. Murdered [Gomez]. And of course under these circumstances, that was inevitable. [¶] So whether he is an actual stabber or not, whether he aided and abetted with the intent to kill or not, he's guilty of murder as a natural and probable consequence of his act.' But the prosecutor did not believe the jury needed to reach that theory: 'I would submit to you that he is either an actual stabber, which is possible, or he's an aider and abettor to murder, period. You don't even need to get to this theory as to Rico Lopez.'" (*Lopez II*, *supra*, 14 Cal.5th at pp. 574–575.)

The trial court instructed the jury on three theories of first degree, premeditated murder, two of which (actual killer and direct aiding and abetting) are still valid and one of which (aiding and abetting under the natural and probable consequences doctrine) was subsequently invalidated by our Supreme Court.

The jury was correctly instructed that to convict a defendant of murder, the prosecution must prove beyond a reasonable doubt that the defendant unlawfully killed a human being with malice aforethought. (§ 187, subd. (a).) Jurors also were told that the crime of first degree murder requires the specific intent to kill. Jurors were instructed that if they found Lopez guilty of murder, they had to determine whether the murder was of the first or second degree. They were told that murder is of the first degree where it is "perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought." (See § 189, subd. (a).) "Deliberate" was defined as "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action," and "premeditated" was defined as "considered beforehand." (See *People v. Morales* (2020) 10 Cal.5th 76, 88.) The trial court instructed the jury that a principal in a crime includes a person "who directly and actively

10

commit[s] the act constituting the crime" (i.e., an actual killer). (See CALJIC No. 3.00.)

The jury also was told that they could convict Lopez if he directly aided and abetted in a crime. (CALJIC No. 3.00.) Aiding and abetting was correctly defined as a person acting (1) with knowledge of the unlawful purpose of the perpetrator, and (2) with "the intent or purpose of committing or encouraging or facilitating the commission of the crime," and (3) by act or advice aiding, promoting, encouraging or instigating the commission of the crime. (See *Lopez II*, *supra*, 14 Cal.5th at p. 579.)

Defendants objected on various grounds to the standard jury instruction regarding the natural and probable consequences doctrine (CALJIC No. 3.02). Lopez's attorney objected in a way that presaged the rationale later articulated in *Chiu*, stating that "as far as I'm concerned, a premeditated, deliberated murder is not the ordinary probable consequence of almost anything except a premeditated, deliberated murder. And that's why it specifically differentiates when the presumption is that any murder is a second degree murder, that's the presumption."

The court nonetheless instructed the jury on the natural and probable consequences doctrine, "as it was understood at the time: 'One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.' (See CALJIC No. 3.02.) The elements were (1) the commission of a target crime, here breach of the peace, an assault, a battery, an assault with a deadly weapon, or an assault by force likely to produce great bodily injury; (2) '[t]he defendant aided and abetted one of those crimes'; (3) '[a] co-principal in that crime committed the crime of murder'; and (4) '[t]he crime of

11

murder was a natural and probable consequence of the commission' of the target crime. (*Ibid*.) The court instructed the jury on the elements of the target crimes, as well as first degree murder, second degree murder, and manslaughter." (*Lopez II*, *supra*, 14 Cal.5th at p. 576.)

Of particular focus in these habeas proceedings, the jury was correctly instructed that if it found a defendant guilty of first degree murder, jurors would then need to determine whether the gang-murder special circumstance (§ 190.2, subd. (a)(22)) was true. "For the gang-murder special circumstance, the court instructed the jury in relevant part as follows: 'The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true. [¶] If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant *with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree.* [¶] You must decide separately as to each of the defendants the existence or nonexistence of each special circumstance alleged in this case.' (See CALJIC No. 8.80.1.) The court continued, 'To find that the special circumstance "intentional killing by an active street gang member" is true, it must be proved: [¶] 1. *The defendant intentionally killed the victim*; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The members of that gang engaged in or have engaged in a pattern of criminal gang activity; [¶] 4. The defendant knew that the gang members engaged in or have engaged in a pattern of criminal gang activity; and [¶] 5. The murder was

12

carried out to further the activities of the criminal street gang.' (See CALJIC No. 8.81.22.)" (*Lopez II*, *supra*, 14 Cal.5th at pp. 576–577, italics added.)

"The jury deliberated for approximately four and a half days before reaching a verdict. During deliberations . . . , the jury asked for clarification on premeditation and deliberation in the context of the natural and probable consequences doctrine. Its note stated, 'We are having difficulties with the sentence[,] "To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill," versus deliberated and premeditated breach of peace or assault that results in a killing. [¶] We need more clarification of premeditation and deliberation [CALJIC No. 8.20] and how to relate it to [CALJIC No. 3.02, regarding natural and probable consequences].' After a lengthy discussion with counsel, the court provided the following response: 'The term "deliberate and premeditate[d]" refers only to First Degree Murder. First Degree Murder is defined by jury instruction 8.20. [¶] The term "deliberate and premeditate[d]" is not an element of any of the following: Breach of the Peace, Assault, Battery, Assault by Means of Force [L]ikely to Produce Great Bodily Injury, or Assault with a Deadly Weapon. Those crimes are defined elsewhere in the Court's instructions[.] [¶] . . . [¶] Jury instruction 3.02 may refer to First Degree Murder, Second Degree Murder or Voluntary Manslaughter, depending upon what you determine the facts to be. Those crimes are defined elsewhere in the court's instructions.' " (*Lopez II*, *supra*, 15 Cal.5th at pp. 577–578.)

13

The jury returned verdicts against each defendant. Lopez was convicted of first degree premeditated murder (§§ 187, subd. (a), 189).[2] The verdict form stated that the jury found Lopez guilty of first degree murder "in that he did unlawfully, willfully, and with malice aforethought, premeditation, and deliberation, murder" Gomez. But it did not specify which theory jurors relied on to convict Lopez.[3] The jury also found true as to Lopez a gang-murder special circumstance (§ 190.2, subd. (a)(22)) and a criminal street gang sentencing enhancement (§ 186.22, subd. (b)(1)). The trial court sentenced Lopez—who was 19 years old at the time of the killing—to life in prison without the possibility of parole. Division Four of this court affirmed the judgment in an unpublished opinion. (*Amante*, *supra*, A113655.)

Nearly five years after Lopez's conviction was affirmed, our Supreme Court decided *Chiu*, *supra*, 59 Cal.4th 155. In *Chiu*, the court held that an aider and abettor may not be found liable for first degree murder for aiding and abetting some other offense, the natural and probable consequence of which was first degree murder. (*Id.* at p. 166.) The basis of this holding was that "the connection between the defendant's culpability and the

---

[2] Amante, Cardenas, and Higuera also were convicted of first degree premeditated murder (§§ 187, subd. (a), 189). Ochoa-Gonzales was acquitted of murder but convicted of being an accessory after the fact (§ 32) with a gang enhancement (§ 186.22, subd. (b)(1)).

[3] That the verdict form stated the murder was deliberate and premeditated did not conclusively establish the points. Verdict forms must be construed in light of the instructions and issues presented to the jury. (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272–1273.) Here, the jury was instructed that it could return a verdict for first degree murder based on the natural and probable cause doctrine, but it was never given a first degree murder verdict form that did not reference deliberation and premeditation. Thus, it was possible for the jury to have signed the verdict form without necessarily finding that Lopez acted with deliberation and premeditation.

14

perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder . . . , especially in light of the severe penalty involved and the . . . public policy concern of deterrence." (*Ibid.*) The court determined that the "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Ibid.*)[4]

The instant proceedings arose when Lopez filed a petition for a writ of habeas corpus in the trial court challenging his conviction based on *Chiu* error.[5] The trial court issued an order to show cause. The prosecutor

---

[4] The Legislature later entirely eliminated natural-and-probable-consequences liability for murder as it applies to aiding and abetting (§§ 188, subd. (a)(3), 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 2, 3). (See *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

[5] Amante also sought habeas relief based on *Chiu* error. Division Four of this court denied relief. (*In re Amante* (Nov. 5, 2015, A145920) [petn. den.].) The order denying the petition stated that *Chiu* error was harmless beyond a reasonable doubt because "[t]he jury necessarily found that petitioner acted with the requisite mental states for purposes of direct aiding and abetting when they found the gang murder special circumstance of Penal Code section 190.2, subdivision (a)(22) to be true. This gang special-circumstance finding is compatible only with the theory that petitioner aided and abetted the murder directly and not with aiding and abetting under the natural and probable consequences theory." This is essentially the reasoning of *Lopez I*.

The Supreme Court denied Amante's petition for review. (*In re Amante* (Jan. 13, 2016, S230603) [petn. rev. den.].) Division Four later affirmed the trial court's denial of Amante's and Cardenas's petitions to have their convictions vacated and to be resentenced under section 1172.6 (originally codified as 1170.95). Our Supreme Court has granted review in both cases on the issue of whether a jury's true finding on a gang-murder special circumstance (§ 190.2, subd. (a)(22)) precludes a defendant from making a prima facie showing of eligibility for resentencing. (*People v. Amante* (June 6, 2022, A161567) [nonpub. opn.], petn. rev. granted Aug. 10, 2022, S275395;

15

opposed Lopez's petition, but did not dispute that *Chiu* error occurred. In the return to the order to show cause, the prosecutor argued that because the jury had determined Lopez had acted with an intent to kill when it found true the gang-murder special circumstance (§ 190.2, subd. (a)(22)), it "c[ould not] reasonably be said, either as a matter of law or fact, that Lopez's first degree murder conviction was based on the natural and probable consequences doctrine."

The trial court granted Lopez's petition because it could not conclude that the instructional error was harmless beyond a reasonable doubt. The People appealed. In this court, the People again argued that the *Chiu* error was harmless since the jury made the findings necessary for the gang-murder special circumstance (§ 190.2, subd. (a)(22)). This court agreed and reversed the trial court's order granting the petition for habeas corpus. Lopez sought review in our Supreme Court, which granted review.

As discussed in more detail below, in *Lopez II* the Supreme Court held that the gang-murder special circumstance, standing alone, does not establish that *Chiu* error is harmless beyond a reasonable doubt. (*Lopez II, supra*, 14 Cal.5th at p. 586.) In addition, the court stated that this court in analyzing harmlessness had failed to fully evaluate the evidence. (*Id.* at p. 588.) Instead of applying its announced standard governing harmlessness of the instructional error, the Supreme Court remanded to this court without expressing a view, as it typically does, on the proper resolution of the issue. (*Id.* at p. 592; cf. *In re Ferrell* (2023) 14 Cal.5th 593, 605–606 [*Chiu* error not harmless beyond a reasonable doubt]; *People v. Aledamat* (2019) 8 Cal.5th 1, 3–4 (*Aledamat*) [instructional error harmless]; *In re Martinez* (2017)

---

*People v. Cardenas* (June 30, 2022, A161694) [nonpub. opn.], petn. rev. granted Sept. 14, 2022, S275778.)

16

3 Cal.5th 1216, 1227 [instructional error not harmless since Attorney General did not show beyond a reasonable doubt that jury relied on legally valid theory]; *Chiu, supra,* 59 Cal.4th at pp. 158–159, 167 [instructional error not harmless because court could not conclude that murder conviction was based on a valid theory]; *People v. Chun* (2009) 45 Cal.4th 1172, 1205 [instructional error harmless because no jury could find felony murder without also making findings necessary for valid conscious-disregard-for-life theory of malice].)

III.
DISCUSSION

Applying the standard announced by the Supreme Court in *Lopez II,* we are unable to establish with certainty that the *Chiu* error at Lopez's trial was harmless beyond a reasonable doubt.  We therefore conclude that the trial court correctly granted Lopez's petition for a writ of habeas corpus.

"Where[, as here], a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred [because t]he defendant has been deprived of his or her right to 'a jury properly instructed in the relevant law.' " (*Lopez II, supra,* 14 Cal.5th at p. 580.)  As we have said, it is undisputed here that *Chiu* error occurred at Lopez's trial.  And it is further undisputed that we evaluate whether the error was harmless under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  (*Neder v. United States* (1999) 527 U.S. 1, 8, 15–16.)  That is, the test "is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Neder* at p. 15, citing *Chapman* at p. 24.)

The concern that arises when juries are instructed with alternate theories of liability, one of which turns out to be invalid, is that the jury might have relied on the invalid theory in reaching its verdict and thus did not make all the findings necessary for conviction under a valid theory.  *Chiu*

17

held that in such situations, "reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167.)  It concluded that the instructional error in that case was not harmless since the record showed that the jury might have based its first degree, premeditated murder verdict on the natural and probable consequences theory.  (*Ibid.*)  The jury had sent two notes indicating that jurors were deadlocked on whether the defendant was guilty of first- or second-degree murder.  (*Id.* at pp. 167–168.)  Because these notes indicated that the jury might have been focusing on the natural and probable consequences doctrine, the court was unable to conclude beyond a reasonable doubt that the jury ultimately based its verdict of first-degree murder on a legally valid theory (i.e., that the defendant directly aided and abetted a first-degree murder).  (*Id.* at p. 168.)

A few years after *Chiu,* the Supreme Court likewise held, in *In re Martinez*, *supra*, 3 Cal.5th 1216, that *Chiu* error was reversible "unless the reviewing court concludes beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant of first degree murder." (*Id.* at p. 1218.)  The court found that it was irrelevant that sufficient evidence supported the defendant's conviction for first degree murder or that the jury could reasonably have found the defendant guilty on a valid theory.  (*Id.* at pp. 1225–1226.)  The question was whether it could be shown "beyond a reasonable doubt that the jury actually relied on th[e valid] theory." (*Id.* at p. 1226.)  The court concluded that there was nothing in the record that would allow the court to "rule out a reasonable possibility that the jury relied on the invalid natural and probable consequences theory," a conclusion that was supported by the fact that the prosecution had relied on that theory in closing argument and the jury asked a question about aiding

18

and abetting liability.  (*Id.* at pp. 1226–1227; see also *In re Johnson* (2016) 246 Cal.App.4th 1396, 1408 [because court could not conclude beyond a reasonable doubt that jury actually based verdict on alternative valid legal ground, *Chiu* error was not harmless].)

Proof that a jury actually rested its verdict on a proper ground may establish harmlessness, but it is not necessary to finding harmlessness. (*Lopez II, supra,* 14 Cal.5th at p. 582, fn. 3.)  An alternative-theory instructional error may be considered harmless if it would be impossible in light of all the evidence for the jury to have made some findings without also having made the findings necessary for a conviction under a valid theory. (*Aledamat, supra,* 8 Cal.5th at pp. 14–15.)  In *Aledamat,* the defendant was charged with assault with a deadly weapon (a box cutter).  (*Id.* at p. 3.)  The trial court instructed the jury on an invalid theory, that the box cutter was inherently deadly.  (*Ibid.*)  But it also instructed the jury on a valid theory, that the defendant used the box cutter in a deadly way.  (*Ibid.*)  The Court of Appeal reversed the conviction since there was no basis in the record to conclude that the jury actually relied on the valid theory.  (*Id.* at p. 5.) *Aledamat* clarified that a reviewing court need not determine whether the jury actually relied on a valid theory of first degree, premeditated murder, if there are other ways to determine harmlessness.  (*Id.* at p. 9.)  The court explained that "the usual 'beyond a reasonable doubt' standard of review established in *Chapman*[, *supra,*] 386 U.S. 18, 24 . . . for federal constitutional error applies," which means that "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt."  (*Aledamat* at p. 3.)  Several circumstances in *Aledamat* convinced the court beyond a reasonable doubt

that the error there did not contribute to the verdict: the jury instructions made it unlikely the jury would view the box cutter as inherently deadly without considering the circumstances of the case, and defense counsel did not contest that the box cutter was a deadly weapon. (*Id.* at pp. 13–14.) And under the instructions, the jury necessarily found that the defendant acted with a deadly weapon, he was aware of facts that would lead a reasonable person to realize his actions would directly and probably result in the application of force to someone, and he had the present ability to apply such force. (*Id.* at p. 15.) Since no reasonable jury that made all of those findings could have failed to have also found that the defendant used the box cutter in a way that was capable of causing or likely to cause death or great bodily injury, the error was harmless beyond a reasonable doubt. (*Ibid.*)

In *Lopez I*, we relied on *Aledamat* and concluded that the *Chiu* error was harmless beyond a reasonable doubt based on the true finding on the gang-murder special circumstance (§ 190.2, subd. (a)(22)). *Chiu* had noted that liability under the natural and probable consequences doctrine was vicarious in nature. (*Chiu, supra*, 59 Cal.4th at p. 164.) " 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' " (*Ibid.*) Here, though, the jury was instructed that to find the circumstance true for an aider and abettor, jurors

20

had to find that Lopez acted with the intent to kill.  (CALJIC No. 8.80.1.)  We reasoned that a true finding required proof beyond a reasonable doubt that Lopez acted with an intent to kill, as opposed to the intent to commit one of the target crimes.  (See, e.g., *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 590 ["[F]or liability under the natural and probable consequences doctrine, the aider and abettor need only have the intent to participate in a target offense; guilt for the charged crime is thereby imputed to him."].)  In other words, we essentially held that it was " 'possible to determine from other portions of the verdict that the jury necessarily found [Lopez] guilty on a proper theory,' " that is, the valid aiding and abetting theory.  (*Aledamat*, *supra*, 8 Cal.5th at p. 8.)

*Lopez II* rejected this conclusion and held that the gang-murder special circumstance was insufficient to demonstrate that *Chiu* error was harmless beyond a reasonable doubt.  (*Lopez II*, *supra*, 14 Cal.5th at pp. 586–587.)  In reaching its holding, *Lopez II* stated that the gang-murder special circumstance "does not itself establish the elements of first degree premeditated murder under either a direct perpetrator or an aiding and abetting theory."[6]  (*Id.* at p. 586.)  Of course, a true finding on the gang-murder special circumstance alone *never* establishes all the elements of first degree murder, nor is it intended to.  The special circumstance is not a theory of murder but is an issue that is considered by the jury only *after* the defendant is "found guilty of murder in the first degree."  (§ 190.2, subd. (a).)

As the Supreme Court noted, this court in *Lopez I* did not focus on the theory that Lopez was the actual killer.  (*Lopez II*, *supra*, 14 Cal.5th at

---

[6] In *Lopez I*, we did not mean to suggest that the special circumstance established the underlying liability on a valid theory, only that it established *harmlessness* when considered with the findings the jury did make.

21

p. 586.)  The parties have never disputed that the jury, if it believed Lopez was the actual killer, received valid instructions to support a verdict that Lopez was guilty of first degree, premeditated murder.  (*Id.* at p. 579.)  The Supreme Court, however, remarked that "if the jury found Lopez was an actual killer, it is reasonably possible the jury could have believed he did not personally premeditate and was liable only for second degree murder." (*Id.* at p. 586.)  But this would be true only if the jury relied *only* on the instructions for the gang-murder special circumstance, and we know it did not.  The jury was expressly instructed to consider the special circumstance only if it first found that a defendant was guilty of first degree murder.  Thus, if the jury believed Lopez was an actual killer, it necessarily found that he acted with deliberation and premeditation when it convicted him of first degree murder since jurors received accurate instructions on this theory.  If the jury believed Lopez was an actual killer who acted *without* deliberation and premeditation, it would have convicted him of second degree murder, which was one of the options the jury was given and rejected.  In that case, the jury would never have reached the instructions for the gang-murder special circumstance.

As for aiding and abetting, *Lopez II* likewise stated that the special circumstance "does not, itself, show the jury necessarily found Lopez guilty on a proper theory" (i.e., direct aiding and abetting).  (*Lopez II, supra,* 14 Cal.5th at p. 587.)  As the jury here was instructed, a defendant is guilty of direct aiding and abetting when that person aids and abets the commission of a crime with knowledge of the unlawful purpose of the perpetrator and with the intent of committing or encouraging the crime promotes, encourages, or instigates the commission of the crime (CALJIC No. 3.01).  (*Lopez II* at pp. 587–588.)  *Lopez II* observed that while the relevant language of the special-circumstance finding "evokes similar concepts, it does not cover all

22

the elements of direct aiding and abetting" (*id.* at p. 587), and "[t]he gang-murder special-circumstance instruction falls far short of explaining these principles [of direct aiding and abetting] to the jury." (*Id.* at p. 588.) Again, the instruction, standing alone, is not intended to explain all principles of direct aiding and abetting. Still, as we discuss in detail below, we cannot establish conclusively that if the jury relied on aiding-and-abetting principles to convict Lopez, it relied on the valid theory of direct aiding and abetting, or the invalid theory of the natural and probable consequences doctrine.

In considering harmlessness, *Lopez II* instructs us "to 'examine[] what the jury necessarily did find and ask[] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.'" (*Lopez II*, *supra*, 14 Cal.5th at p. 589, quoting *Aledamat*, *supra*, 8 Cal.5th at p. 15.) While the Supreme Court stated that the findings necessary for the special circumstance fall "far short" of all findings necessary for conviction under a theory of direct aiding and abetting, it did not elaborate on the missing fact or facts. (*Lopez II* at p. 588.) Elsewhere, however, the Supreme Court pointed out that direct aiding and abetting requires the jury to have found that Lopez " 'aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator,'" which means that " 'the aider and abettor must know and share the murderous intent of the actual perpetrator.'" (*Lopez II* at p. 585.) " 'An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder.'" (*Ibid.*, quoting *Chiu*, *supra*, 59 Cal.4th at p. 167.) Accordingly, even though the jury here found in relation to the special circumstance that Lopez "with

23

an intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted" someone else in the commission of first degree murder (CALJIC No. 8.80.1), the finding did not *necessarily* establish the missing fact needed for a direct aiding-and-abetting theory—i.e., that Lopez knew the unlawful purpose of the killer. (*Lopez II* at pp. 576–577.)

*Lopez II* faulted our previous opinion as having only "nodded" to the duty to analyze harmlessness when we observed that the evidence supporting Lopez's first degree murder conviction was "overwhelming."[7] (*Lopez II*, *supra*, 14 Cal.5th at p. 588.) Instead, we are to "essentially ask[] whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial court could have had reasonable doubt regarding the findings necessary to convict [Lopez] on a valid theory." (*Id.* at p. 591.)

*Lopez II* instructs that we may hold the instructional error harmless only if "it would be *impossible*, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*Lopez II*, *supra*, 14 Cal.5th at p. 568,

---

[7] *Lopez I* referred to the "overwhelming" evidence supporting the verdict in part to distinguish this case from *People v. Brown* (2016) 247 Cal.App.4th 211, upon which both the trial court and Lopez had relied. *Brown* concluded that the *Chiu* error in that case was not harmless beyond a reasonable doubt for what *Lopez I* characterized as three "unique" reasons, one of which was that the evidence against the defendant in *Brown* was not overwhelming. (*Brown*, *supra*, at pp. 215, 226–227.) *Lopez I* observed that this was not the case here since "the evidence against [Lopez] was overwhelming. He was seen after the murder with blood on his clothes and shoes and holding a knife handle, and he also bragged about the stabbing afterward. His appellate attorney in the original appeal did not even challenge the sufficiency of the evidence supporting his first degree murder conviction, which was reasonable given the record." The Attorney General is correct that this court's observation was not conflating the standard for evaluating the sufficiency of the evidence with the standard for reviewing harmlessness under *Chapman*.

italics added.) "This test is exacting, and it requires much of a reviewing court. . . . 'If, at the end of [a thorough] examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' " (*Id.* at p. 581.) We do not become " ' "in effect a second jury to determine whether the defendant is guilty," ' " but instead we " 'ask[] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' " (*Ibid.*) We likewise "must determine whether any rational jury would have found [Lopez] guilty based on a valid theory if the jury had been properly instructed." (*Id.* at p. 584.) That is, we look at what we "can determine, beyond a reasonable doubt, that any rational jury would surely have found based on the verdict and the evidence here." (*Id.* at p. 589.)

On the one hand, we have difficulty concluding that any *rational* jury that had received valid aiding and abetting instructions would have reached a different verdict based on the evidence here. (*Lopez II*, *supra*, 14 Cal.5th at p. 584.) Extensive and largely uncontradicted evidence suggested that the four gang members convicted of first degree murder premeditated and planned to kill Gomez and understood and shared each other's unlawful purpose. Arming themselves with knives after they heard the whistle of a rival gang coming from what was considered disputed gang territory, they ran outside of the apartment where they had been socializing and chased Gomez down a bicycle path that ran under a bridge toward a creek, where Gomez received 38 to 40 stab wounds and had his pants pulled down. And we know from the verdicts and special circumstance finding that Lopez, even if he was only an aider an abettor and not the actual killer, formed an intent

25

to kill at some point during the incident.  (§ 190.2, subd. (a)(22).)  These facts and circumstances suggest to us that it was highly likely that Lopez either killed Gomez with deliberate premeditation or knew of the actual killer's unlawful purpose.

On the other hand, we cannot say it would have been "*impossible, based on the evidence*" for the jury to have made the findings it made— including the finding that Lopez acted with an intent to kill—without having made the findings that would support a valid theory of liability.  (*Lopez II*, *supra*, 14 Cal.5th at p. 568, italics added.)  *Lopez II* faulted *Lopez I* for failing to have considered "whether a rational jury, having rendered the verdicts at issue here, would *necessarily* have to believe the cited testimony [in *Lopez I*] regarding Lopez, especially his bragging about the stabbing."  (*Lopez II*, at p. 591, italics added.)  On this point, we must allow that the jury could have discounted this testimony no matter which theory it used to convict Lopez. The prosecutor argued to the jury that Lopez's participation in the killing of Gomez would have benefited Lopez's status as a Norteños gang member since he was from an out-of-town subset of the gang.  While it seems implausible, the jury could have concluded that Lopez initially intended only to aid and abet one of the target crimes, formed an intent to kill during the attack without premeditation and deliberation, and later inflated his involvement in the killing to boost his reputation as a gang member.

*Lopez II* instructs more generally that "[t]he evidence a [reviewing] court may consider under *Aledamat* does not necessarily extend to the whole body of evidence supporting the verdict.  Rather, a court must determine what evidence a jury would rationally have to believe. . . .  It is well settled that the jury has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit.  ' "[T]he jury properly may

26

reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material." ' " (*Lopez II*, *supra*, 14 Cal.5th at p. 591, quoting *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67–68 [reversing order granting new trial; testimony could not defeat proximate cause as a matter of law since it was jury's role to resolve conflicts in evidence and jurors could believe some, but not all, testimony] and citing *People v. Crooker* (1956) 47 Cal.2d 348, 355 [no error not to give jury instruction on the right for a defendant to have counsel throughout proceedings, including during custodial interrogation, since a jury may accept as true some but not all of a witness's testimony].) "The question here is not the sufficiency of the evidence to support a valid theory, but its opposite. To determine the sufficiency of the evidence, a reviewing court essentially asks whether any rational juror could have made the findings necessary to convict the defendant on a valid theory. To determine harmlessness under *Aledamat*, a reviewing court essentially asks whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory." (*Lopez II* at p. 591.)

Under this standard, there is a scenario, however unlikely, that a jury could have reached a verdict based on an invalid theory without making the findings necessary for a valid theory of first degree premeditated murder. Jurors could have found that Lopez aided and abetted one of the five target

27

crimes,[8] and that the natural and probable consequence of the crime he aided and abetted was first degree premeditated murder (CALJIC No. 3.02). Jurors would not necessarily have had to find that Lopez knew and shared the murderous intent of the actual perpetrator (cf. *Lopez II*, *supra*, 14 Cal.5th at p. 585), just that first degree murder was a natural and probable consequence of aiding and abetting one of the target crimes. Only after reaching such a verdict on the invalid theory would jurors have considered the gang-murder special circumstance. Their true finding on this allegation established that the jury determined that Lopez either (1) "intentionally killed the victim" (CALJIC No. 8.81.22) or (2) aided and abetted first degree murder " 'with the intent to kill.' " (*Lopez II*, *supra*, 14 Cal.5th at p. 586.) And the verdict form stated that jurors found that Lopez so acted while he was an active participant in a criminal street gang. Again, though, jurors

---

[8] Breach of the peace was defined as (1) a person willfully and unlawfully fighting another person or challenging another person to fight and (2) the fight or challenge occurring in a public space. (CALJIC No. 16.260.) Assault was defined as (1) a person willfully and unlawfully committing an act which by its nature would probably and directly result in the application of physical force on another person, (2) the person committing the act was aware of facts that would lead a reasonable person to realize that a result of this act that physical force would be applied to another person, and (3) at the time the act was committed, the person committing it had the ability to apply physical force to another person. (CALJIC No. 9.00.) Battery was defined as (1) a person using force or violence on another person and (2) the use was willful and unlawful. (CALJIC No. 16.140.) Assault with a deadly weapon was defined as (1) a person being assaulted and (2) the assault was committed with a deadly weapon or instrument other than a firearm or by means of force likely to produce great bodily injury. (CALJIC No. 9.02.) And jurors were told that assault by means of force likely to produce great bodily injury could be committed with hands or fists (which would apply to the fact that the victim was found with his pants down), and there must be proof that the manner of the assault was likely to produce great bodily injury on another person. (CALJIC No. 9.02.)

were not required to find that Lopez shared the murderous intent of a direct perpetrator if they found he aided and abetted a target crime. The jury could have believed that Lopez (without a premeditated intent to kill) joined his companions in chasing Gomez, that one of Lopez's companions had a premeditated intent to kill of which Lopez was unaware (but was the natural and probable consequence of one of the target crimes he aided and abetted), that Lopez aided the killer in one of the target offenses, and that Lopez only formed an intent to kill during the altercation and without premeditation.

The Attorney General has not pointed to any facts in the record, nor have we discovered any, that conclusively negate the possibility of the foregoing scenario. In its supplemental briefing following remand, the People stress that the special circumstance established that Lopez had a motive based on his gang affiliation to murder Gomez, which supports a finding of first degree murder. (E.g., *People v. Gonzalez* (2012) 54 Cal.4th 643, 663 [motive to kill is one of three categories relevant to determining premeditation and deliberation].) According to the People, the *Chiu* error was thus harmless if Lopez was also found to have planned the murder. But it is not *impossible* for the jury to have concluded that Lopez only aided and abetted his companions in attacking Gomez, without knowing that whoever killed Gomez did so with deliberation and premeditation and without himself having planned to murder Gomez.

The Attorney General relies on *People v. Covarrubias* (2016) 1 Cal.5th 838, which is distinguishable. There, jury instructions erroneously permitted jurors to find the defendant guilty of felony murder based on entry into the victims' home with an intent to kill, without having to make the required finding that the defendant entered the residence with an intent to steal or commit a robbery. (*Id.* at p. 881.) Our Supreme Court concluded that the

29

error was harmless since the evidence established that the defendant went to the victims' home with an intent to both steal property and to kill anyone present. (*Id.* at p. 883.) And the jury also convicted the defendant of robbery, burglary, and conspiracy to commit burglary and robbery, and it found true a robbery-felony-murder special circumstance. (*Ibid.*) Here, although there was certainly evidence supporting the mens rea necessary to convict Lopez of first degree premeditated murder, the jury made no separate finding that necessarily established it.

The Attorney General also relies on *People v. Gonzalez* (2012) 54 Cal.4th 643, but that case is likewise distinguishable. *Gonzalez* involved a complicated factual scenario where the defendant was accused of the attempted murder of an intended victim, as well as the killing of an accomplice (her boyfriend) under the provocative act doctrine. (*Id.* at p. 649, 654.) "Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder." (*Id.* at p. 655.) One sentence in the jury instructions gave the misimpression that the defendant could be found to have acted with premeditation and deliberation if *either* the defendant *or* an accomplice harbored that mental state, as opposed to focusing solely on the defendant. (*Id.* at pp. 661–662.) The Supreme Court concluded that the error was harmless. (*Id.* at p. 667.) The evidence satisfied all the factors for premeditation and deliberation for the attempted murder of the intended victim, as set forth in *People v. Anderson* (1968) 70 Cal.2d 15, 26–27: (1) events before the murder indicating planning, (2) motive, and (3) a method of killing that reflects a preconceived design to kill. (*Gonzalez* at pp. 663–664.) Evidence of the defendant's planning and deliberation "was quite strong," whereas evidence that the

accomplice alone intended a deadly outcome "was weak." (*Id.* at p. 665.) According to *Gonzalez*, a reviewing court is to focus "on proof beyond a reasonable doubt that *a rational jury* would have found the defendant guilty absent the [instructional] error." (*Id.* at p. 666.) Because no rational jury could have found that the defendant intended to murder the intended victim but did not personally act with premeditation and deliberation, the instructional error was harmless. (*Ibid.*) Here, though, there was no such finding as to another victim that compels the conclusion that the jury necessarily found that Lopez premeditated and deliberated or shared the perpetrator's murderous intent.

We agree with the Attorney General that *People v. Anthony* (2019) 32 Cal.App.5th 1102 shares striking similarities with this case. There, our colleagues in Division Two concluded that *Chiu* error in a gang murder case was harmless beyond a reasonable doubt based on reasoning similar to *Lopez I*'s reasoning. The court relied in part on the same finding on the gang-murder special circumstance (§ 190.2, subd. (a)(22), see *Anthony* at p. 1113) and noted that such findings indicated that the defendants who aided and abetted murder did so "with the intent to *kill*" and "not merely to assault" the victim. (*Anthony* at p. 1146.) The court noted it would have been "nonsensical" for jurors to conclude that the shooter acted with premeditation and deliberation but was aided and abetted by "three defendants who did not form the intent to kill until the murder occurred." (*Id.* at p. 1146.) Still, *Anthony* did not go so far as to hold that it would have been impossible to conclude this, as *Lopez II* instructs. The Supreme Court denied review in *Anthony*. (S255109, petn. rev. den. June 19, 2019.) But *Lopez II* does not cite to *Anthony* even though the case was relied on heavily in the parties'

Supreme Court briefing.  Thus, we decline to follow *Anthony* because we cannot conclude that its analysis survives *Lopez II*.

Our conclusion that the error here was not harmless is consistent with the Supreme Court's recent opinion in *In re Ferrell*, *supra*, 14 Cal.5th 593, another case involving alterative-theory error.  (*Id.* at pp. 596–597.) Witnesses in *Ferrell* observed the defendant shoot the victim, but conflicting evidence was presented on which way the defendant's arm was pointing, and the defendant told police he shot the gun in the air.  (*Id.* at pp. 597–598.) Jurors at the defendant's trial were instructed both with two valid theories of second degree murder (express malice murder and implied malice murder) and on a theory of second degree felony murder that was later invalidated (felony murder based on the willful discharge of a firearm in a grossly negligent manner).  (*Id.* at pp. 599, 601–602.)  The jury convicted the defendant of second degree murder and also found true a sentencing enhancement that he personally and intentionally discharged a firearm in the commission of a felony and caused death (§ 12022.53, subd. (d)).  (*Ferrell*, at pp. 596, 603.)  The Secretary of the Department of Corrections and Rehabilitation argued that the finding on the enhancement, when considered with the evidence presented at trial, established that the defendant must have intentionally shot toward people and thus acted with sufficient malice to establish implied-malice murder.  (*Id.* at p. 604.)

The Supreme Court disagreed.  Citing *Lopez II* and *Aledamat*, the court summarized the standard of review for cases involving alternative-theory instructional error as follows:  "[W]e do not view the evidence supporting the valid theory in the light most favorable to the prosecution, but instead consider whether a reasonable jury, given the findings actually made and the state of the evidence, could have found in favor of the defendant."  (*In re*

32

*Ferrell*, *supra*, 14 Cal.5th at pp. 604–605.) The court concluded that the jurors could have reasonably rejected the theory that intentionally firing a gun at people amounted to malice. (*Id.* at p. 605.) "[J]urors could have concluded [the defendant] intentionally discharged his weapon but credited [his] subjective belief he was pointing the gun to 'the air' the 'whole time,' never at people, and the shooting was accidental in this way." (*Ibid.*) Taken together, the jury's findings and the evidence was consistent with the felony-murder theory, and "it would not have been ' "impossible, upon the evidence," ' for such a jury to reject implied malice and second degree murder verdict based on that theory." (*Id.* at p. 606.) Because it was not impossible to have found what the verdict did find (an intentional discharge) without also finding implied malice, and because a rational fact finder "could have rejected malice and rendered a different verdict but for the erroneous felony murder instructions, [the defendant's] second degree murder conviction [could ]not be affirmed by looking to the evidence." (*Id.* at p. 608.)

Likewise here, it was not *impossible* for the jury to have found that Lopez, with only an intent to commit one of the target offenses, joined the other defendants who armed themselves with knives and chased someone they believed to be affiliated with a rival gang in disputed territory, and only later formed an intent to kill, without having premeditated, deliberated, or shared the mental state of the actual killer. Because the People cannot demonstrate beyond a reasonable doubt that the *Chiu* error was harmless, the trial court correctly granted Lopez's petition for a writ of habeas corpus.

IV.

DISPOSITION

The order granting Lopez's petition for a writ of habeas corpus is affirmed.

_____

Humes, P.J.

WE CONCUR:

_____

Banke, J.

_____

Bowen, J.*

     *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*In re Lopez*  A152748

34